# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

October 13, 2022

**<u>Via ECF</u>**
Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **<u>United States v. Sharrahn Walton</u>**
      22 Cr. 420 (LAK)

Dear Judge Kaplan:

At 25 years old, Sharrahn Walton has been incarcerated for virtually his entire adulthood. He entered state prison when he was eighteen years-old and has been in custody continuously ever since, serving the final part of a concurrent federal prison sentence hundreds of miles from his family under pandemic lockdowns. He now comes before this Court because, in the final months of his federal sentence, he left his halfway house in the Bronx, an offense for which he has lost eight months of "good time" credit.

Mr. Walton committed no new crimes after leaving the halfway house. Instead, he spent time with his family, including his seven-year-old son, who was just a few months old when Mr. Walton went to prison. Given these circumstances, most notably the loss of his good time credit, additional judicial sanctions are not necessary to comply with 18 U.S.C. § 3553(a). I respectfully ask the Court to sentence Mr. Walton to time served.

## I.   Personal Background

### a.   *Birth to Drug-Addicted Parents & Upbringing with his Great Grandmother*

Mr. Walton's early life leaves little doubt as to how he comes to be before this Court for sentencing. Mr. Walton was born in 1997 to a crack-addicted mother and a father who both used and sold crack. Neither of his parents were equipped to raise him, and both proved unreliable, volatile presences in his childhood. The family

Honorable Judge Lewis A. Kaplan                    October 13, 2022
United States District Judge                                   page 2

lived with his mother's grandmother, Doretha Samuels, in her three-bedroom house
in Haverstraw, New York in Rockland County. With Mr. Walton's own mother
cycling in and out of jail, Doretha stood in as his caretaker. Mr. Walton warmly
recalls Doretha taking him to Disneyworld as a child and him helping her at the
grocery store and the laundromat. Every night, he would bring her a glass of water
after she climbed into bed. Doretha used to tell him: "Trouble is easy to get into, but
hard to get out of." Mr. Walton wishes he had had the maturity as a teenager to
follow her advice.

Mr. Walton's godmother, Nikki Merriman, also stepped in to help raise him
and his sisters, Anai and Zaire. Nikki confirms: "Sharrahn was born in a family of
addicts, so his grandmother, Doretha, raised him the best she could. Sharrahn had
to become a man before he was a child. He had many obstacles in his life, along with
heart aches." **Exhibit A** (Letter of Nikki Merriman). Mr. Walton's maternal aunts,
Leslie and Tameka, were also positive influences in his life and helped "mother"
him through childhood. Nikki, Leslie, and Tameka remain steadfast members of
Mr. Walton's support community in Rockland County, having watched him grow up
in difficult circumstances.

When Mr. Walton was fourteen years old, his biological mother received a
lengthy prison sentence and largely fell out of touch with her children. His father
moved out, leaving Mr. Walton exclusively in Doretha's care. Today, Mr. Walton is
not in touch with his mom. In reflecting on his feelings about her, he says simply:
"It's like the addiction part took over the mother part… I guess she chose drugs over
me."

   b.  *Taking to the Streets*

With his parents largely absent, Mr. Walton was left to his own devices. He
"took to the streets," as his father describes it, and "made them his family." *See*
**Exhibit B** (Letter of Jerry Wilson). He began both using and selling drugs. When
he was thirteen years old, he started smoking marijuana, and by the time he was
fifteen, he was regularly using pills like Percocet, Oxycodone, and Xanax. Mr.
Walton recalls his drug use as "trying to avoid reality," referring to his lack of
family support. Doretha and Nikki tried to get him help, sending him to Lexington
Center and the Haverstraw Center for mental health and drug treatment. Though
these programs were not enough to save Mr. Walton from future criminal
involvement, he formed strong bonds with his counselors, as evidenced in the letters
they submitted in 2018 in support of Mr. Walton's sentencing before Judge Román.
*See* **Exhibit C** (Letter of Peter Fata) & **Exhibit D** (Letter of Tim Saunders).

Nevertheless, Mr. Walton soon incurred a slew of arrests. Around the time
his mom disappeared, when he was fourteen years-old, he was arrested for robbery
and spent eighteen months at a juvenile detention center in Lincolndale, New York.

Honorable Judge Lewis A. Kaplan                    October 13, 2022
United States District Judge                                    page 3

He returned home to Doretha's care but continued to spend time on the streets. In
July 2014, when he was seventeen years old, Mr. Walton was arrested for gun
possession. He posted bail and returned to the streets. Shortly thereafter, he
learned that his then-girlfriend and long-time friend, Dymond Buxton, was
pregnant, and that he would soon be a father. Feeling a sudden pressure to make
money, he dropped out of high school and began more seriously dealing drugs.

    *c.  Continuous Incarceration Since Age Eighteen*

    It was during this time that he engaged in the conduct that resulted in his
federal prosecution, a non-violent, multi-co-defendant crack-selling conspiracy in
which he played a relatively minor role. On January 15, 2016, when he was
eighteen years-old, he sold crack cocaine to a confidential source, a transaction that
would form the basis of his federal drug conviction. Ten days later, he was arrested
for robbery. But for the two months he was at large on the instant case, Mr. Walton
has remained in some form of custody ever since that arrest – effectively his entire
adulthood to date.

    There is no doubt that Mr. Walton made poor decisions at this age. Yet even
as a wayward teenager, he showed early signs of maturity, giving Doretha up to
$200 a week to help her pay the mortgage. Nikki, too, recalls that Mr. Walton was
an unusually reliable teenager:

> He was always the kid who you could ask for help without getting any
> attitude or complaints. If you needed him, he would be there. Sharrahn
> was always polite and responsible because that's the way his grandma
> raised him. I have always found him to be a self-motivated person. No
> matter how down he felt, he still made a way to put a smile on his face
> and others.

Exh. A.

    During this time, Mr. Walton took seriously his upcoming role of fatherhood.
He was present for his son, J█████'s, birth and the first few months of his life. Sadly,
as he was arrested and remanded just six months after J█████ was born, Mr. Walton
missed most of the first several years of his son's life.

Honorable Judge Lewis A. Kaplan                                    October 13, 2022
United States District Judge                                                    page 4

    

*Sharrahn Walton, age 18, as a new father.*

After his arrest in January 2016, Mr. Walton pled guilty to both gun possession and attempted second-degree robbery in Rockland County. He was sentenced to eight years' imprisonment on the gun case and a concurrent year on the robbery. In August 2016, he was transferred on a writ to federal custody to face prosecution on drug charges. In April 2018 he pled guilty to violating 21 U.S.C. § 841(b)(1)(B) and was sentenced to 60 months of custody to be served concurrently with his state sentence.[1]

Mr. Walton served the bulk of his concurrent sentences in state prison, where he earned his GED and completed programs in masonry and plumbing. During this time, Dymond and J█████ would visit him weekly, allowing Mr. Walton to watch J█████ grow and maintain a relationship with him. His other family from Rockland County would visit him too, including his sisters, his aunts, Nikki, and Doretha. These visits and phone calls sustained him through the remainder of his state sentence, though they were brutally curtailed in 2020 when the COVID-19 pandemic struck.

In September 2020, Mr. Walton completed his state sentence and was transferred to FCI Petersburg in Virginia to complete his federal sentence. Hundreds of miles from home, and still isolated by pandemic-related restrictions, Mr. Walton spent a year and a half without seeing Dymond, J█████, and his other close family members.

---

[1] In November 2019, Mr. Walton's eight-year state sentence for gun possession was vacated as excessive. In July 2020 he was resentenced to 5 years' incarceration, to still be concurrent with his federal sentence.

Honorable Judge Lewis A. Kaplan                    October 13, 2022
United States District Judge                                    page 5

     Nevertheless, he once again tried to make the most of his time in prison.
Though programming was virtually non-existent due to the pandemic, Mr. Walton
got a cleaning job at the prison. He incurred no disciplinary incidents, and filled his
free time reading James Patterson novels, attending church, and awaiting his
return to New York.

## II.     Offense Conduct

     On February 1, 2022, Mr. Walton was transferred to a halfway house in the
Bronx. He was desperate to be reunited with his family, and especially with J▮▮▮▮.
He was also eager to see Doretha, who was by then gravely ill and in hospice care.
While Mr. Walton was incarcerated, she had lost her home and moved in with Mr.
Walton's aunt, Leslie. Mr. Walton's family members are adamant that Doretha held
onto life in her final months in the hopes of seeing Mr. Walton, the little boy she
had raised, one last time before she died. *See, e.g.* Exh. A & **Exhibit E** (Letter of
Leslie Ashby).

     Mr. Walton asked the halfway house for permission to visit Doretha in
Rockland County. *See, e.g.*, **Exhibit F** (Request for Pass). But the halfway house
was slow to respond. Mr. Walton's family, too, repeatedly asked his counselors to
allow him to spend time with Doretha before she passed away, but their requests
were largely unanswered. On at least two occasions, counselors told Mr. Walton's
family he could leave for extended visits with Doretha. His family drove to the
Bronx and waited hours to pick him up, only to learn the halfway house had not in
fact granted him a pass. In the end, Mr. Walton was only able to spend two short
visits with Doretha before she passed away at the end of February 2022. After her
passing, Mr. Walton and his family asked for permission for Mr. Walton to attend
Doretha's funeral. They submitted proof of her funeral arrangements to the halfway
house, which nevertheless did not approve the visit in time for Mr. Walton to
attend.

     Mr. Walton was heartbroken. Doretha had been the constant in his life, as he
had lived with her since his birth until his incarceration – literally his entire life
outside of custody. Realizing going "home" no longer meant returning to Doretha hit
Mr. Walton hard. As Nikki explains:

> [Sharrahn's grandma] was very sick with Alzheimer's before she passed.
> There were moments where she would forget everyone's name, but she
> surely remembered Sharrahn's name, who she considered her son. The
> Alzheimer's was making her worse and worse but she made sure she
> stayed here to at least have some time with him. Mentally it's really
> hard on Sharrahn because he lost the person that raised him.

Exh. A.

Honorable Judge Lewis A. Kaplan                          October 13, 2022
United States District Judge                                    page 6

    Mr. Walton nevertheless tried to focus on completing his time at the halfway house. He focused his sights on reconnecting with J████ and preparing for life as a more present father. He got a job at a company that providing cleaning, repairs, and maintenance service to NYCHA buildings, and worked every day from 7am to 4pm, earning about $100 a day. He voluntarily completed a parenting class, in the hopes that doing so would earn him more passes to see his son.



*Mr. Walton and J████ in 2022.*

    Mr. Walton spoke to J████ every day. For the first time since J████ was a baby, he was able to spend time with his son outside the context of a prison visiting area. He discovered that J████ was, as Mr. Walton gushes, "energetic, smart, caring, funny, creative." Mr. Walton fell in love with his son all over again and began counting the weeks until he could spend every day with him. He felt an excruciating longing to get back to Rockland County, but the halfway house was sparing in granting him passes and would often limit the number of hours he could be away such that he didn't have enough time to get to Rockland County and back. It was in this context, in a moment of frustration, that Mr. Walton walked out of the halfway house and didn't return.

    Mr. Walton did not go out and commit new crimes. Unsurprisingly, he went straight to Rockland County and spent time with his family. During the two months he was at large, he spent as much time as he could with J████, picking him up from school, attending his baseball games, and taking him to Splashtown (a water park). Dymond confirms:

        During the time he was away from the halfway house, which resulted in
        this new case, Sharrahn was spending a lot of time with J████ J████
        is an active kid who likes to be outside, so we would all go to the park a

Honorable Judge Lewis A. Kaplan                    October 13, 2022
United States District Judge                                    page 7

lot. We would also attend his baseball games and football practices together.

**Exhibit G** (Letter of Dymond Buxom). Nikki, too, confirms that J████ was Mr. Walton's primary focus while he was at large:

> Sharrahn's a great father. His son J████ gave him a reason to keep going. They spent a lot of time together when Sharrahn was around. I watched their bond grow together from a distance because of how long Sharrahn has been away from J████'s life. When Sharrahn was away from the halfway house, he would bring J████ to the community center to play basketball because J████ is one active little boy. Whatever Sharrahn's grandma taught him growing up, he shared that with J████. He's very involved in his upbringing.

Exh. A.

Mr. Walton also spent time visiting his sisters, his aunts, and Nikki – all of whom were still mourning the loss of Doretha. Though Mr. Walton knew he should not have left he halfway house, he rationalized his conduct because he felt he need to spend time with his family after so many years of incarceration, and after spending most of the pandemic hundreds of miles from them under lockdown.

## III.   Future Plans for Rentry

Mr. Walton knows that he made a mistake. He is disappointed in himself, as he recognizes that he made an impulsive decision that, in addition to the instant case, cost him his "good time" in the Bureau of Prisons. Yet despite these consequences, Mr. Walton knows that one day he will be released from prison. When that happens, he will have to be a responsible adult -- a father, co-parent, brother, nephew, and son. Mr. Walton takes these obligations seriously, and is already developing clear plans for what he intends to when he starts his period of supervised release.

True to form, Mr. Walton is focused first and foremost on his son. He and Dymond recently learned that J████ has a cyst on his brain, which, although reportedly benign, requires medical monitoring. Mr. Walton wants to be present for his son's doctor's visits. J████ also loves to play football but was recently told to avoid contact sports due to the cyst. Mr. Walton wants to help J████ find a different sport or activity that will excite him in lieu of football. In short, Mr. Walton is determined to be a present, reliable, and proactive father, or as Mr. Walton says

Honorable Judge Lewis A. Kaplan                                     October 13, 2022
United States District Judge                                                    page 8

humbly: "I want to be better than my father was for me… I want to be a parent that
[he] can look up to and trust."

Upon his release, Mr. Walton intends to live with Dymond and J████ in
Suffern, New York. Dymond, too, confirms, that Mr. Walton is welcome to live with
them as a family. *See* Exh. G. In addition to spending time with Dymond and J████,
Mr. Walton is eager to spend time with his sisters, aunts, and Nikki. In particular,
his sister Zaire has an eleven-year-old daughter, Avery, and Mr. Walton would like
to get to know his niece better now that she is more grown.

Mr. Walton has a job waiting for him when he is released. His aunt Leslie's
husband, Mark Coursar, owns a paving company called C&M Paving, and is
prepared to employ Mr. Walton as soon as he's out. *See* **Exhibit H** (Letter of C&M
Paving). Mr. Walton is eager to put the masonry skills he learned in prison to use
and start earning money to provide more financial stability to J████. He has also
expressed a long-term goal of training to work as a mechanic, as he loved cars
growing up and would like to learn how to fix them.

Finally, Mr. Walton remains amenable to drug treatment, as was
recommended at his sentencing before Judge Román. Mr. Walton acknowledges
that he abused drugs, particularly pills, as a teenager, and he wants to make sure
he does not repeat that mistake in moments of stress surrounding his reentry. He is
happy to have the support of the Department of Probation in avoiding drug use and
staying out trouble.

## IV.   Appropriate Sentence

"In deciding what sentence will be sufficient, but not greater than necessary
to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must
have a generosity of spirit, that compassion which causes one to know what it is like
to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir.
2017) (cleaned up). As Mr. Walton has already lost his "good time" credit, a period of
approximately eight months, a sentence of time served on the instant offense is
"sufficient, but not greater than necessary," to comply with the mandate of 18
U.S.C. § 3553(a).

First, the **nature and circumstances of this offense** are serious but not
unmitigated. Mr. Walton walked out of the halfway house to be with his family,
nothing more. He did not commit new crimes, nor did he make any effort to flee the
state of New York. To the contrary, the U.S. Marshal Service arrested Mr. Walton
in the parking lot of Dymond's apartment complex, where he went to visit J████.
There was simply no nefarious motive to Mr. Walton's conduct here; he just wanted
to be with his loved ones.

Honorable Judge Lewis A. Kaplan                                                 October 13, 2022
United States District Judge                                                            page 9

Second, Mr. Walton's **history and characteristics** weigh in favor of
leniency. As illustrated above, Mr. Walton was born into circumstances that largely
set him up to fail. Though he had Doretha's love and support, and the efforts of
Nikki and his aunts to provide guidance, Mr. Walton lacked parental support and
role models. His criminal record, which is the reason he was in BOP custody in the
first place and the reason he falls within Criminal History category V, stems
entirely from adolescence, when abundant research and caselaw makes clear
human brains have not fully matured.[2] Mr. Walton had barely attained adulthood
when he became a father and was sent to prison, and has thus had virtually no
opportunity to live life as an adult outside of confinement. Nevertheless, the two
months he was on escape status reveal precisely how he will spend his time when
release: staying out of trouble and spending time with his family.

Mr. Walton's support network makes clear that despite his troubled youth, he
is a good person worthy of compassion, leniency, and an opportunity for another
chance. *See* Exhs. A, B, C, D, E & G. In explaining how Mr. Walton has positively
inspired her own professional development, Dymond perhaps best illustrates the
kind of person Mr. Walton is, and the kind of hope he inspires in others:

> I understand where Sharrahn's faults come from. When you're neglected
> at a young age, many young people are lost trying to find what's missing
> at home. Because of Sharrahn and his case, I got an associate's degree
> in criminal justice. I am working towards pursuing a bachelor's degree
> in social work so I can become a juvenile parole or probation officer. He's
> the reason I want to help kids early on in their lives so they don't go
> down the same road.

Exh. G.

---

[2] As the Supreme Court has now repeatedly concluded, young offenders have less criminal
culpability for several reasons. "First, children have a lack of maturity and an underdeveloped sense
of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are
more vulnerable ... to negative influences and outside pressures, including from their family and
peers; they have limited control over their own environment and lack the ability to extricate
themselves from horrific, crime-producing settings. And third, a child's character is not as well
formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable
depravity." *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551,
569-70 (2005)) (cleaned up). This endorsement reflects the "ever-growing body of research in
developmental psychology and neuroscience" indicating that "adolescent brains are not yet fully
mature in regions and systems related to higher-order executive functions such as impulse control,
planning ahead, and risk avoidance." *Id*. at 471-72 n. 5 (quoting Brief for American Psychological
Association et al. as Amici Curiae 3).

Honorable Judge Lewis A. Kaplan                                    October 13, 2022
United States District Judge                                            page 10

Finally, the goals of achieving **respect for the law, punishment, deterrence, public safety, and rehabilitation** also support a sentence of time served. As noted, Mr. Walton has already been punished for walking out of the halfway house, as he's been returned to custody and stripped of his "good time" credit. While he was previously scheduled to leave the halfway house in September 2022, he has now been told he will remain in BOP custody until at least May 2023 – an additional *eight months* of incarceration. Such time is no small punishment for a young man eager to return to his family. Though he never intends to return to a position where "escape" is a crime he can commit, the extant consequences of his conduct have already deterred him from any future misconduct. And Mr. Walton's conduct while on escape status – committing no new crimes and spending time with his loved ones – confirms that a sentence of time served will not in any way threaten public safety. Indeed, the Department of Justice's own research shows that at age 25, Mr. Walton now presents a significantly lower risk of recidivism than his adolescent self.[3]

Most important, a sentence of time served will cause no further delay in the commencement of Mr. Walton's sentence of supervised release, which will facilitate the goal of rehabilitation as it is what will truly allow Mr. Walton to rejoin the community as a responsible adult.

## V.      Conclusion

Mr. Walton has already been punished for walking out of his halfway house. Given that he has spent virtually his entire adulthood in custody, more prison is not going to do anything for him in terms of punishment, deterrence, or rehabilitation. What Mr. Walton needs is supervision in the community so he can begin life in earnest as an adult.

For the reasons stated above, I respectfully ask the Court to sentence Mr. Walton to time served. In the alternative, I ask for a below-guideline sentence to run concurrent with his underlying federal sentence, so as not to delay the commencement of his period of supervised release.  Mr. Walton has more than learned his lesson; no further judicial sanction is necessary to achieve the goals of sentencing.

---

[3] *See* National Institute of Justice, *From Youth Justice Involvement to Young Adult Offending*, Department of Justice, Office of Justice Programs (Mar. 10, 2014) https://nij.ojp.gov/topics/articles/youth-justice-involvement-young-adult-offending#reports (noting that "[t]he prevalence of offending tends to increase from late childhood, peak in the teenage years (from 15 to 19) and then decline in the early 20s.")

Honorable Judge Lewis A. Kaplan                          October 13, 2022
United States District Judge                                        page 11

                                              Sincerely,

                                              */s/ Hannah McCrea*
                                              Hannah McCrea
                                              Assistant Federal Defender

CC:    AUSA Jeffrey Coyle
       Sharrahn Walton

## EXHIBIT LIST

| A | Letter of Nikki Merriman, Mr. Walton's godmother |
|---|---|
| B | Letter of Jerry Wilson, Mr. Walton's father |
| C | Letter of Peter Fata (2018), Mr. Walton's former counselor |
| D | Letter of Tim Saunders (2018), Mr. Walton's former counselor |
| E | Letter of Leslie Ashby, Mr. Walton's aunt |
| F | Request for Pass (to see great grandmother in hospice) |
| G | Letter of Dymond Buxom, the mother of Mr. Walton's son |
| H | Letter of C&M Paving, indicating Mr. Walton has a job lined up for when he's released |